**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

Molly Martin, *et al.*,

                Plaintiffs,           Civ. No. 13-2563 (RHK/JJG)
                                                    **MEMORANDUM OPINION
                                                    AND ORDER TO SHOW
                                                    CAUSE**
v.

Cargill, Incorporated,

                Defendant.

---

Melissa W. Wolchansky, Clayton D. Halunen, Susan M. Coler, Halunen & Associates, Minneapolis, Minnesota, Michael R. Reese, Kim E. Richman, Reese Richman, LLP, New York, New York, for Plaintiffs.

Jan M. Conlin, Stephen P. Safranski, Christopher W. Madel, Kate E. Jaycox, Heather M. McElroy, Robins Kaplan Miller & Ciresi LLP, Minneapolis, Minnesota, for Defendant.

Jared H. Beck, Beck & Lee Trial Lawyers, Miami, Florida, Erin Green Comite, Scott + Scott LLP, Colchester, Connecticut, Joseph P. Guglielmo, Scott + Scott LLP, New York, New York, Anna M. Horning Nygren, Karen Hanson Riebel, Lockridge Grindal Nauen P.L.L.P., Minneapolis, Minnesota, for Objector Denise Howerton.

---

**INTRODUCTION**

This putative class action arises out of the marketing and sale of "Truvia" sweetener products by Defendant Cargill, Incorporated ("Cargill"). Presently before the Court are (1) the Motion of Plaintiffs Molly Martin and Lauren Barry for preliminary approval of a nationwide settlement and certification of a settlement class (Doc. No. 8) and (2) Cargill's Motion for a stay of litigation in all other courts, and an injunction against the commencement of new actions, concerning Truvia products (Doc. No. 16),

both of which were heard on October 23, 2013. For the reasons that follow, the Court will deny the Motions.

## BACKGROUND

Truvia is a calorie-free sweetener sold and marketed by Cargill. Cargill claims in its advertising that Truvia is "born from the sweet leaf of the stevia plant," a plant native to South America. It developed Truvia because of a large consumer demand for "natural," low-calorie sweeteners rather than artificial sweeteners such as saccharin, and it highlights Truvia as a "natural" product in its labeling, advertising, marketing, and promotional materials. According to Plaintiffs, however, Cargill's representations are false – Truvia is manufactured using "a multi-step process involving the use of toxic chemicals" and, hence, is neither "natural" nor "born" from the stevia plant.

On February 12, 2013, Martin commenced an action against Cargill in the Hennepin County, Minnesota District Court, alleging that Cargill misrepresented the true nature of Truvia in violation of several Minnesota consumer-protection statutes. She purported to represent a class of "[a]ll consumers within the State of Minnesota who purchased Truvia" for household use. On February 28, 2013, she voluntarily dismissed the action to allow the parties to "attempt to resolve th[e] matter through mediation." The following day, her counsel advised Cargill that they also represented a California-based plaintiff (Barry) who alleged similar claims on behalf of a *nationwide* class, but who would not file a lawsuit until the Martin mediation had been completed.

Over the ensuing months, counsel for Plaintiffs and Cargill participated in several mediation sessions in Minneapolis. As part of that process, Cargill provided information

"regarding the marketing, manufacturing and labeling of Truvia Consumer Products," though the parties have been vague about precisely what was tendered. For example, they aver that Cargill disclosed "profit and loss statements" and "information regarding [its] sales to grocery stores and other retailers," but they have not informed the Court *what* the statements contained or *what* the information provided. Regardless, the parties made some progress, but by July they had not yet reached a settlement.

On July 8, 2013, a putative nationwide class action regarding Cargill's labeling, marketing, and sale of Truvia products, styled Denise Howerton v. Cargill, Inc., No. 13-cv-0336 LEK-BMK, was filed in the United States District Court for the District of Hawaii. Howerton was represented by different counsel than Plaintiffs here, but Cargill's counsel was the same. Additional lawsuits were later threatened by other potential plaintiffs regarding the marketing and labeling of Truvia, and in fact two nationwide class actions were filed in the United States District Court for the Central District of California and the United States District Court for the Southern District of Florida.

Meanwhile, on August 2, 2013, Cargill reached a settlement with Plaintiffs here. The parties then prepared an agreement memorializing the settlement terms, which included among other things (1) a payment of $5.3 million by Cargill, to be divided *pro rata* by all class members and from which up to $1.59 million would be deducted for attorneys' fees and expenses,[1] (2) that certain changes would be made to Cargill's

---

[1] The $5.3 million comprises a settlement fund of $5 million and an additional $300,000 to cover costs incurred administering the settlement. From the $5 million, each class member submitting a claim will receive either (i) a cash payment of between $10 and $72, depending upon how many Truvia products the class member purchased, or, at his or her election, (ii) vouchers for the

labeling and marketing of Truvia products, and (3) a release of all claims against Cargill by any class member – meaning any person nationwide who purchased Truvia products since July 2008 – relating to Cargill's labeling, marketing, or advertising of Truvia.  The settlement agreement further provided that it could be "used as the basis for an injunction against[] any action, suit, or other proceeding that may be instituted, prosecuted, or attempted" asserting claims similar to those in this case.  Simply put, the settlement attempts to buy Cargill "global peace" related to its labeling and marketing of Truvia.

There is no indication in the record, however, that the Hawaii court, Howerton, or her counsel (or the plaintiffs or counsel in any other litigation or threatened litigation) were advised that a settlement had been reached.  Instead, on September 18, 2013, Plaintiffs commenced this action, and on the very next day, the parties filed the instant Motions, asking the Court to (1) preliminarily approve their settlement and certify a settlement class as described above, and (2) enjoin "all pending and future cases brought by settlement class members" concerning Truvia products, due to the settlement.[2]  Only

---

purchase of Truvia products (with estimated values between $18 and $120).  In no event, however, will Cargill pay more than $5 million to class members, and hence each class member's recovery largely depends upon the total number of claimants and the amount of their claims; if insufficient funds exist to satisfy all claims at the amounts discussed above, payments will be reduced *pro rata*.  Moreover, the fund is subject to further reduction to cover administrative expenses exceeding $300,000 (if any).

[2] The Court notes that Cargill's proposed injunction is overbroad, as it seeks to enjoin (i) "any actions or proceedings pending in any state or federal court in the United States *involving* Cargill's Truvia Natural Sweetener" and (ii) all settlement class members from "filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise) or receiving any benefits from any other lawsuit, arbitration, or administrative, regulatory, or other proceeding or order in any jurisdiction *arising out of or relating to* the Truvia Consumer Products."  Such an injunction would prohibit, for example, an individual from commencing a product-liability action alleging that he or she was injured by consuming Truvia,

*then* were the Hawaii court and Howerton notified that a settlement had been reached here. This Court later directed Plaintiffs and Cargill to notify the parties in all other actions (including the federal actions in California and Florida) about the pendency of the instant Motions, in order to afford them an opportunity to object. The Court has received one Objection – from Howerton – to the proposed settlement and the desired stay/injunction.

## STANDARD OF REVIEW[3]

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action requires court approval, which may issue "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Review of a proposed class-action settlement, therefore, typically proceeds in two stages. At the first stage, the parties submit the proposed settlement to the Court, which must make "a preliminary fairness evaluation." Manual for Complex Litigation (Fourth) (hereafter, "Manual") § 21.632 (2004); accord, e.g., Valencia v. Greater Omaha Packing, Nos.

---

or alleging that Cargill and others in the sweetener industry had engaged in price fixing. These allegations would be well beyond the scope of the Complaint in this action but would nevertheless "involve" or "relate to" Truvia and, hence, fall within the proposed injunction.

[3] The Court addresses here only the request for preliminary approval of the proposed settlement because, absent approval, the parties' remaining Motions are moot. Should the proposed settlement *later* pass muster, however, the Court will be required to address whether certification of a class is appropriate under Federal Rule of Civil Procedure 23(a). E.g., Bennett v. Nucor Corp., 656 F.3d 802, 814 (8th Cir. 2011) ("A district court considering a motion for class certification must undertake 'a rigorous analysis' to ensure that the requirements of Rule 23(a) are met.") (citation omitted). Rule 23(a) requires "(1) that the class be so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that the representative parties will fairly and adequately protect the interests of the class." Id. While the first three prongs appear to be satisfied here, the concerns discussed below call into question whether the fourth prong has been met.

8:08CV88, 8:08CV161, 2013 WL 5347442, at *1 (D. Neb. Sept. 23, 2013); Schoenbaum v. E.I. DuPont de Nemours & Co., No. 4:05CV01108, 2009 WL 4782082, at *2 (E.D. Mo. Dec. 8, 2009). If the proposed settlement is preliminarily acceptable, the Court then directs that notice be provided to absent class members, in order to afford them an opportunity to be heard on, object to, and opt out of the settlement. Fed. R. Civ. P. 23(c)(3), (e)(1), (e)(5); see also Grunin v. Int'l House of Pancakes, 513 F.2d 114, 120 (8th Cir. 1975) ("[D]ue process requires that notice of a proposed settlement be given to the class.").

At the preliminary-approval stage, "the fair, reasonable and adequate standard is lowered, with emphasis only on whether the settlement is within the *range* of possible approval due to an absence of any glaring substantive or procedural deficiencies." Schoenbaum, 2009 WL 4782082, at *3 (emphasis added) (internal quotation marks and citations omitted). That said, preliminary approval is not simply a judicial "rubber stamp" of the parties' agreement. In re Inter-Op Hip Prosthesis Liab. Litig., 204 F.R.D. 330, 338 (N.D. Ohio 2001). Indeed, the Court must be particularly scrupulous because preliminary approval establishes "an initial presumption of fairness." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995); accord, e.g., Chun-Hoon v. McKee Foods Corp., No. C 05-0620, 2009 WL 3349549, at *2 (N.D. Cal. Oct. 15, 2009). Rule 23(e) "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Gen. Motors, 55 F.3d at 805; accord In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 932 (8th

Cir. 2005) (court must "act[] as a fiduciary, serving as a guardian of the rights of class members."). Only careful review of a proposed settlement can discharge this obligation. Manual § 21.61 ("Judicial review must be exacting and thorough. The task is demanding because the adversariness of litigation is often lost after the agreement to settle."); Zimmerman v. Zwicker & Assocs., P.C., Civ. No. 09-3905, 2011 WL 65912, at *3 n.5 (D.N.J. Jan. 10, 2011) ("Motions for preliminary approval of a class action settlement . . . are not perfunctory.").

## ANALYSIS

**I.     The present record is insufficient to merit settlement approval**

The Court recognizes the strong federal policy in favor of promoting and encouraging settlements. E.g., In re Gen. Motors, 55 F.3d at 784. Nevertheless, the present record leaves the Court unable to preliminarily approve the parties' settlement.

The primary problem with the parties' submissions is that they provide almost no information enabling the Court to gauge the value of the proposed class's claims and, hence, the fairness and adequacy of the settlement. In re Wireless Tel., 396 F.3d at 933 ("The most important consideration . . . is the 'strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.'") (quoting Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1150 (8th Cir. 1999)). When analyzing a proposed settlement, the Court should "begin by quantify[ing] the net expected value of continued litigation to the class," and then "estimat[e] the range of possible outcomes and ascrib[e] a probability to each point on the range." Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7th Cir. 2006) (internal quotation marks and citations omitted). This is not a

simple mathematical exercise with definite outcomes; a "high degree of precision cannot be expected in valuing a litigation." Id. But the Court must "nevertheless insist[] that the parties present *evidence* that would enable [] possible outcomes to be estimated, so that [it] can at least come up with a ballpark valuation." Id. (emphasis added) (internal quotation marks and citations omitted); accord, e.g., In re Gen. Motors, 55 F.3d at 806; Manual § 21.62.[4]

There is little evidence here from which the Court can make such a "ballpark valuation." Plaintiffs ask the Court to certify a nationwide class of purchasers of Truvia products over a five-year period, which the parties estimate comprises *five million people*. But the record contains sparse information about the number of this huge class's purchases, the amount they allegedly "overpaid" based on Cargill's "misrepresentations," or the profit derived therefrom by Cargill, making an assessment of potential damages impossible. Indeed, Plaintiffs' damages "model" lacks clarity.

Plaintiffs allege, for example, that consumers paid a "premium" for Truvia products believing they were natural, when in fact they were not. (See Compl. ¶ 65 ("Plaintiffs and the Class members would not have purchased the Products *at the price offered* had they known the true facts about the Products.") (emphasis added).) For this, they seek to recover the "premium" allegedly paid. (See id. ¶ 82.) At oral argument,

---

[4] This analysis, of course, principally applies to Plaintiffs' (and the class's) claims for damages. The Court has not ignored Plaintiffs' claims for injunctive relief mandating changes to the marketing and labeling of Truvia products or the changes Cargill has agreed to make under the settlement. Nevertheless, the Court believes those changes add little to the "valuation" mix for two reasons. First, consumer class actions are primarily driven by the recovery of damages and attorneys' fees. Second, the proposed changes will not aid the class in any significant way, as its members have (allegedly) already been "deceived" by the labeling and marketing of Truvia.

Plaintiffs' counsel averred – without any supporting evidence – that the "premium" amounted to "maybe a dollar or two." (10/23/13 Hr'g Tr. at 16-17.) Hence, if each of the 5 million class members purchased only one Truvia product, the total damages the class could recover would be between $5 million and $10 million. Yet at the same time, Plaintiffs also allege that class members would not have purchased the products *at all* had they known the "truth" about Truvia (Compl. ¶¶ 79-80), and for that they seek to recover the full purchase price (id. ¶ 83). At the hearing, Plaintiffs' counsel averred – again without supporting evidence – that the average price paid for Truvia products is $5.99. (10/23/13 Hr'g Tr. at 11.) But this suggests damages closer to $30 million – 5 million purchases at nearly $6 apiece – assuming each class member made only one Truvia purchase; and the parties' Settlement Agreement, of course, contemplates that some class members bought *12 or more* Truvia products. The possible universe of damages, therefore, is quite broad, ranging from $5 million on the low end to well over $100 million on the high end (assuming multiple purchases by many class members at $6 each). Adding to the confusion, Plaintiffs claim to seek *either or both* types of damages. (Compl. ¶ 103 (asserting that damages equal "the purchase price of the Products *and/or* the premium paid for the Products") (emphasis added).)

Furthermore, the parties have provided nothing but generalities about the relative strengths and weaknesses of the class's claims and Cargill's potential defenses. Plaintiffs assert, for example, that they are "convinced their case has merit, but recognize substantial risk is involved in continued litigation." (Halunen Decl. ¶ 21.) But they offer no specifics. Rather, they simply assert "the expense and length of continued

proceedings . . . and . . . the uncertain outcome and risk of litigation, as well as the difficulties and delays inherent in such litigation," render the settlement in the class's "best interest." (Id. ¶ 22.) Yet, the same is true in nearly every class action, as Plaintiffs themselves recognize. (Id. (arguing this case is "no different" than other "complex class actions," which "always [involve] the possibility that [the plaintiffs] may not prevail if th[e] action continues").) As one court stated when denying preliminary settlement approval under similar circumstances:

> Plaintiff's explanation why the Court should approve the Amended Settlement is little more than a discussion of the risks inherent in prosecuting almost any class action. There is always a chance that a court might not certify a class, that the jury might find plaintiffs have not met their burden of proof, or that an appellate court might overturn a verdict. The question is, what is the chance that one or more of these events will happen in this case? Plaintiff's explanation is unpersuasive because it is so generic it could be used to justify a wide range of possible settlements here. *The Plaintiff should place in the record an estimate of the class members' claims so that the Court can demonstrate it has a rational basis to approve the Amended Settlement, particularly since Plaintiff proposes to settle the class members' claims so early in the litigation.*

Galloway v. Kan. City Landsmen, LLC, No. 4:11-1020-CV-W-DGK, 2013 WL 3336636, at *4-6 (W.D. Mo. July 2, 2013) (emphasis added) (citations omitted); accord, e.g., Cordy v. USS-Posco Indus., No. 3:12-cv-00553, 2013 WL 4028627, at *4 (N.D. Cal. Aug. 1, 2013) ("[A]ny fraction has a denominator, and without knowing what it is the Court cannot balance plaintiffs' expected recovery against the proposed settlement amount."); Sobel v. Hertz Corp., No. 3:06-CV-00545, 2011 WL 2559565, at *10 (D. Nev. June 27, 2011). The record leaves it nigh impossible for this Court to compare the value of the proposed settlement with a reasonable estimate of the class's likely recovery.

This case's procedural posture exacerbates the problem.  "Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important."  Manual § 21.612.  Such "settlement class actions" require "closer judicial scrutiny than approval of settlements reached only after class certification has been litigated through the adversary process."  Id.  Indeed, because the proposed settlement was negotiated here prior to a class being certified, Plaintiffs are subject to an even "*higher* showing of fairness."  In re Gen. Motors, 55 F.3d at 805 (emphasis added) ("We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified."); accord, e.g., In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1063 (8th Cir. 2013) (noting that the Eighth Circuit gives "heightened [] attention" to settlements "when the parties have agreed upon a class definition and a settlement before formally initiating litigation") (internal quotation marks and citations omitted); Galloway, 2013 WL 3336636, at *2; Sobel, 2011 WL 2559565, at *6.

But Plaintiffs sought settlement approval *the day after filing their Complaint*; no formal discovery or preliminary motion practice has occurred.  As the Manual notes, when a "case is filed as a settlement class action . . . with little or no discovery, it may be more difficult to assess the strengths and weaknesses of the parties' claims and defenses . . . and to consider how class members will actually benefit from the proposed settlement."  Manual § 21.612; accord, e.g., Fraser v. Asus Computer Int'l, No. C 12-00652, 2012 WL 6680142, at *5 (N.D. Cal. Dec. 21, 2012) (denying preliminary

approval where "insufficient discovery and investigation have been conducted to allow . . . the Court to value the claims in suit"). That is precisely the case here.[5]

This is not to suggest preliminary approval of a class settlement cannot come early in a lawsuit. To hold otherwise would frequently *undermine* the opportunity for settlement, because discovery costs can diminish a defendant's incentive to settle. But where, as here, a court does not possess evidence from which to evaluate the fairness or adequacy of a proposed settlement, it is incumbent upon the parties to "supplement" the record to provide the needed information. Manual § 21.632; accord, e.g., id. § 22.921 ("[T]he parties must provide sufficient information to support their contentions regarding . . . the settlement's fairness, adequacy, and reasonableness."). The briefs and supporting documents here do not suffice. See, e.g., Custom LED, LLC v. eBay, Inc., No. 12-cv-00350, 2013 WL 4552789, at *9 (N.D. Cal. Aug. 27, 2013) (declining to preliminarily approve settlement where, *inter alia*, the parties "provided the Court with no information as to the class members' potential range of recovery"); Sobel, 2011 WL 2559565, at *10 (court could not "even begin th[e] inquiry" where "the parties ha[d] failed to provide . . . evidence of . . . the total amount of . . . fees that were charged to the class members, let alone potential ranges of recovery and the chances of obtaining it").[6]

---

[5] Plaintiffs claim they were afforded "comprehensive discovery" regarding Cargill's marketing and labeling of Truvia products during mediation. (10/23/13 Hr'g Tr. at 6.) Despite this description, however, they have not informed the Court about the breadth of that discovery or, more importantly, the information it contained relevant to the fairness and adequacy of the proposed settlement.

[6] Citing In re Zurn Pex Plumbing Products Liability Litigation, No. 08-MDL-1958, 2013 WL 716088, at *6 (D. Minn. Feb. 27, 2013) (Montgomery, J.), Plaintiffs argue the settlement is "presumptively valid" because it was negotiated at arm's length, with the assistance of a neutral

At bottom, the Court knows nothing about this case beyond the cursory record presented with the instant Motions. See In re Dun & Bradstreet Credit Servs. Customer Litig., 130 F.R.D. 366, 370 (S.D. Ohio 1990) (noting preliminary approval typically is "based upon the court's familiarity with the issues and evidence"). And yet the parties seek the Court's blessing over their settlement, based primarily upon their *ipse dixit* – the proposed settlement is fair, adequate, and reasonable because they say so. The Court cannot approve a settlement on such a rocky foundation. Because "the existing record does not provide any evidence or methodology by which the Court can determine the class members' potential ranges of recovery or their chances of collecting a verdict," the Court is left "unable to make any reasoned assessment of the value of the claims" and, hence, is unable to approve the proposed settlement. Galloway, 2013 WL 3336636, at *6; accord Van Horn v. Trickey, 840 F.2d 604, 607 (8th Cir. 1988) (court must assure settlement approval rests on "well-reasoned conclusions" and not "mere boilerplate").[7]

---

mediator. (Pl. Mem. at 18-19.) But Zurn Pex settled only after "sufficient" discovery, enabling the Court to evaluate the settlement's fairness. Id. at *6; accord In re Uponor, 716 F.3d at 1063 (presumption applied because parties had "engaged in . . . extensive discovery and preparation for trial" before settlement). Where, as here, the precise nature of the parties' informal exchange of information is not presented to the Court, and where no formal discovery has taken place, "it is highly doubtful that a presumption of fairness should apply." Sobel, 2011 WL 2559565, at *6.

[7] At the hearing, Plaintiffs' counsel argued that the information sought by the Court typically is not provided in connection with motions for preliminary approval. (10/23/13 Hr'g Tr. at 23.) But the cases cited here belie that argument; courts will reject requests for preliminary approval where the parties have proffered insufficient information to assess a settlement's fairness.

- 13 -

**II.     Other issues**

In addition to the foregoing, the Court harbors several other concerns.

First, the Court questions the extent to which the proposed settlement actually will benefit class members. As noted, the settlement contemplates a $5 million payment to the class, in amounts varying from $10 to $72 per claim. But the class comprises an estimated five million people, and hence on its face $5 million seems insufficient for class members to receive the suggested payments. To be sure, the Court does not anticipate that all 5 million class members will submit claims, but if even 10% of the class participates, the *most* a class member could hope for is $10 ($10 x 500,000 class members = $5 million), and certainly nowhere near $72.[8]

Furthermore, the $5 million Settlement Fund is subject to reduction for attorneys' fees and costs (up to $1.59 million)[9], and subject to *further* reduction if settlement-administration costs exceed $300,000 – a distinct possibility, given the sheer size of the class and the manner in which the settlement will be advertised and claims processed. And if the Settlement Fund does not contain enough money to pay class members the $10

---

[8] At the hearing, Plaintiffs' counsel suggested that the "take rate" in similar cases is between 1 and 5 percent (10/23/13 Hr'g Tr. at 8), but later suggested the "general benchmark" actually is 1 to 2 percent (id. at 14-15). (Counsel for Howerton, by contrast, suggested a 10 percent "take rate" was more likely. (Id. at 34.)) The so-called "benchmark" offered by Plaintiffs allegedly comes from the claim administrator the parties selected to implement the settlement and oversee the processing of claims. But the Court has carefully reviewed the administrator's Affidavit (Doc. No. 7, Ex. C) and finds nothing supporting the claimed rates; the administrator discusses only the number of people *likely to see the published notice*, not an estimate of what percentage might submit a claim.

[9] Based on its experience handling prior class-action settlements, the Court thinks it unlikely class counsel will request less than the full amount of fees and costs to which Cargill has stated it will not object ($1.59 million).

to $72 contemplated by the settlement, each member's claim will be reduced on a *pro rata* basis. It is not difficult to conceive, therefore, that class members could receive something far less, calling to mind In re Electronic Data Systems Corp. "ERISA" Litigation, No. 6:03-MD-1512, 2005 WL 1875545, at *6 (E.D. Tex. June 30, 2005):

> This may be a good settlement for Plaintiffs' counsel in that they would recoup 100% of their $5.0 million in attorneys' fees and expenses, and it may be a good settlement for [the defendant] in that for a relatively nominal sum it would remove whatever risk it has, but it is not a fair settlement for the Plaintiff class who would only be receiving a few pennies on the dollar.

Accord, e.g., Galloway v. Kan. City Landsmen, LLC, No. 4:11-1020-CV-W-DGK, 2012 WL 4862833, at *7 (W.D. Mo. Oct. 12, 2012) (declining to preliminarily approve settlement that did not "provide the class with reasonable value for their claims").[10]

Second, the Court is troubled by the course of conduct in this case. In particular, defense counsel here also represents Cargill in Howerton but failed to timely inform Howerton, her counsel, and (most importantly) the Hawaii court that settlement discussions had reached fruition in Minnesota – a settlement that *subsumed the Hawaii case*. Instead, counsel waited until this action was filed more than six weeks later and only *then* informed the Hawaii court, moving to stay that action in deference to the settlement. (The Motion was denied.) Not surprisingly, Howerton objects to the proposed settlement and Cargill's request for a stay and injunction, given that the parties "kept this Court, the U.S. District Court for the District of Hawaii, and Plaintiff Howerton

---

[10] At the hearing, Plaintiffs' counsel suggested that the class will receive a "minimum" of $3.236 million, but this number is woven from whole cloth, predicated on an assumption that excess administration costs will not exceed $170,000 – a number with zero support in the record. (10/23/13 Hr'g Tr. at 10-11, 16.)

in the dark as to the litigation and settlement negotiations concerning the very claims Plaintiff Howerton alleged in the District of Hawaii." (Howerton Mem. at 2.)

The Manual for Complex Litigation notes that there are "a number of recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements." Manual § 21.61.  They include, among other things, (1) the existence of a "reverse auction," in which a defendant, seeing competing class cases, cherrypicks the attorneys willing to accept the lowest class recovery, in exchange for enhanced fees, and (2) the voluntary dismissal of class claims for "strategic purposes," such as forum shopping or to obtain more favorable settlement terms.  Id.  The Court cannot say that either has occurred in this case.  Nevertheless, it finds troubling that Howerton and the Hawaii court were kept in the dark once a settlement was reached.  This Court is left with the firm impression that the lack of communication was undertaken for strategic purposes and should not be rewarded.[11]

---

[11] Cargill's counsel asserted at oral argument that their only duty was to Cargill, *i.e.*, there was no obligation to inform other courts (or other plaintiffs) about the settlement discussions. (10/23/13 Hr'g Tr. at 31-32.)  That is perhaps true.  But counsel's failure to quickly alert the Hawaii court once *a settlement had been reached* – a settlement that subsumed the Hawaii case – seems to violate the spirit of counsel's duty of candor to that tribunal.  See, e.g., Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994) ("Every lawyer is an officer of the court.  And, in addition to his duty of diligently researching his client's case, he always has a duty of candor to the tribunal."); Pinkham v. Sara Lee Corp., 983 F.2d 824, 833 (8th Cir. 1992) ("Attorneys, as officers of the court, have the responsibility to present the record with accuracy and candor.").  Counsel also intimated at the hearing that it was unnecessary to inform the Hawaii court until after a final written settlement agreement had been signed.  (10/23/13 Hr'g Tr. at 33.)  Yet, the parties agree that they had "reached agreement on the terms of a settlement" at the conclusion of the third mediation session on August 2, 2013.  (Pl. Mem. at 8; accord Halunen Decl. ¶ 17; Conlin Decl. ¶ 6 (noting that the parties "agreed on the essential terms" as of August 2).)  And, even if only a "tentative" settlement existed until a written agreement was signed, this Court believes the Hawaii court should have been informed about that tentative settlement.

But Howerton creates a more pressing problem. Notably, at the time *this* action was filed, Howerton was already pending in the District of Hawaii, asserting essentially the same claims against the same defendant on behalf of a substantially similar (if not entirely duplicative) nationwide class. The Court is not powerless to act in this situation. Under the "first-filed rule," the court "initially seized of a controversy" generally "should be the one to decide the case." Orthmann v. Apple River Campground, Inc., 765 F.2d 119, 121 (8th Cir. 1985) (citation omitted); see also Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976) ("As between federal district courts, . . . the general principle is to avoid duplicative litigation."). This rule recognizes the comity concerns between coequal federal courts and promotes efficient use of judicial resources by authorizing a latter-filed, substantially similar action's stay or dismissal in deference to an earlier case. Orthmann, 765 F.2d at 121. The first-filed rule "is not intended to be rigid, mechanical, or inflexible, but is to be applied in a manner best serving the interests of justice." Nw. Airlines, Inc. v. Am. Airlines, Inc., 989 F.2d 1002, 1005 (8th Cir. 1993). That said, "[t]he prevailing standard is that in the absence of compelling circumstances, the first-filed rule should apply." Id.

On the present record, the Court does not perceive any "compelling circumstances" undermining the application of the first-filed rule, and this case and Howerton are "substantially duplicative." Ritchie Capital Mgmt., L.L.C. v. Jeffries, 653 F.3d 755, 763 n.3 (8th Cir. 2011). To be sure, the named plaintiffs in Howerton differ from the named Plaintiffs here. Yet, they purport to act on behalf of overlapping, nationwide classes, and "recent cases . . . make clear that *the class members* are the

- 17 -

proper focus of th[e] inquiry." Askin v. Quaker Oats Co., No. 11 CV 111, 2012 WL 517491, at *4 (N.D. Ill. Feb. 15, 2012) (emphasis added) (collecting cases); accord, e.g., Catanese v. Unilever, 774 F. Supp. 2d 684, 688 (D.N.J. 2011) ("the classes, and not the class representatives, are compared" when deciding whether to apply the first-filed rule) (citation omitted); Nesbit v. Fornaro, No. 2:11-cv-00092, 2011 WL 1869917, at *2-3 (D. Nev. Mar. 31, 2011) (Report & Recommendation of Foley, M.J.), adopted, 2011 WL 1869934 (D. Nev. May 16, 2011) (same); Gardner v. GC Servs., LP, No. 10-CV-997, 2010 WL 2721271, at *4 (S.D. Cal. July 6, 2010) (same).

The overlapping nature of the classes, in fact, suggests that the Court *should* apply the first-filed rule here, to prevent the very ills the rule is designed to address. As one leading authority notes:

> One of the most troubling problems in the modern class-action arena is the filing of multiple, competing class actions in state and federal courts all directed toward the same conduct or activities, which are alleged to have caused harm that is multistate, if not national, in scope. Clearly, a single nationwide class action seems to be the best means of achieving judicial economy. In its absence, these competing and duplicative actions not only generate unnecessary litigation and duplicative fees, but also they may result in delay, pose complicated problems of judicial coordination in some instances, increase the risk of disparate verdicts raising serious questions of fairness, and, in situations in which there are limited funds available as compensation, result in the unequal distribution of those funds.

7B Wright & Miller, Federal Practice & Procedure § 1798.1 (3d ed. 2005); accord Rhonda Wasserman, Dueling Class Actions, 80 B.U. L. Rev. 461, 542 (2000) ("Whenever two or more class actions are filed on behalf of the same class, seeking the same relief for the same wrong, numerous problems result: (1) scarce resources are wasted, (2) counsel are subject to intense pressure to settle, (3) class counsel, class

members and the court all are compelled to make important decisions without complete information, and (4) courts are required to grapple with complex and difficult preclusion questions. These problems seriously undermine the utility of the class action vehicle."). These concerns are particularly acute because the Hawaii court has denied Cargill's request to stay Howerton, notwithstanding the instant action and the parties' proposed settlement. Accordingly, the threat of duplicated effort, wasted resources, and inconsistent results is very real.[12]

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Plaintiffs' Motion for preliminary approval of a nationwide settlement and certification of a settlement class (Doc. No. 8) and Cargill's Motion for a stay of litigation pending in all other courts, and an injunction against the commencement of new actions, concerning Truvia products (Doc. No. 16) are **DENIED WITHOUT PREJUDICE**. It is further **ORDERED** that the parties **SHOW CAUSE**, in writing, on or before November 13, 2013, why this action should not be dismissed, stayed, or

---

[12] The parties might argue that this is the first-filed case because it is merely a continuation of the action Martin commenced against Cargill in state court before Howerton was filed, but this argument would fail for two reasons. First, this case differs from the one initially commenced by Martin – here she purports to represent a nationwide class, but in her earlier action she sought to represent only a *Minnesota* class of Truvia purchasers. (See Halunen Decl. Ex. A ¶ 63.) Second, the voluntary dismissal of Martin's initial action rendered it a nullity, as if it had never been brought at all. Sammons v. Pike, 117 N.W. 244, 245 (Minn. 1908) (voluntary dismissal "leav[es] the parties in the position they were in before [the case] was commenced").

transferred to the District of Hawaii under the first-filed rule, and Howerton may serve and file a response to these submissions on or before November 22, 2013.[13]

Date: October 29, 2013            s/Richard H. Kyle
                                                        RICHARD H. KYLE
                                                        United States District Judge

---

[13] In light of the Court's concerns about the first-filed rule, it will defer ruling on Howerton's request for discovery at this time.